IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:22-CV-529-FL

| | |
|---|---|
| BRIANNA CLARK, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) ORDER |
| SAMPSON REGIONAL MEDICAL CENTER, INCORPORATED f/k/a Sampson County Memorial Hospital, Incorporated, | ) |
| Defendant. | ) |

This matter is before the court on defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 15). The motion has been briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff commenced this action December 22, 2022, and filed the operative amended complaint May 31, 2023, asserting claims of discrimination based on race, sex, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") against defendant. Plaintiff also asserts a state law claim for breach of contract. Plaintiff seeks a jury trial and other relief as may be appropriate including declaratory and injunctive relief, compensatory damages, costs, fees, and other litigation expenses.

Defendant filed the instant motion to dismiss the complaint for failure to state a claim upon which relief can be granted, relying upon a contract between plaintiff and defendant. Plaintiff responded in opposition, and defendant replied.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff, "an African American female citizen and resident of Harris County, Texas," "entered into a contract with [defendant] on or about July 1, 2020[,] as a resident in a training and educational program designed . . . and approved by the Accreditation Council for Graduate Medical Education." (Compl. ¶¶ 5, 7). Plaintiff's contract was set for a twelve-month period, during which plaintiff "was to receive training in the field of family medicine." (Id.). "At the time that [p]laintiff joined [defendant], she had already completed two years of residency training at Chistus Spohn Family Medicine residency in Corpus Christi, Texas[,]" and plaintiff allegedly "only needed the twelve months of residency at [defendant] in order to graduate her program." (Id. ¶ 8).

In October 2020, plaintiff "was invited to participate in the process of choosing where [d]efendant's resident retreat would be held." (Id. ¶ 13). Plaintiff was the only "African American resident in her program which consisted of 12 residents." (Id. ¶ 27). At a meeting October 9, 2020, "it was suggested that the retreat be held at a property historically used as a plantation during the time of slavery." (Id. ¶ 14). Plaintiff "voiced her concern . . . regarding the impropriety of staging a work party at a plantation due to the fact that many African Americans would be present and that plantations were a source of trauma for African Americans[.]" (Id.). Plaintiff alleges that following her comment, defendant's chief executive officer, "Dr. Shawn Howerton ["Howerton"] became verbally abusive towards [plaintiff] and physically cornered [plaintiff] while she was attempting to distance herself from him." (Id.).

Plaintiff asserts that Howerton "repeatedly used offensive and sexist language," calling plaintiff a "bitch," telling plaintiff "to stop her bitching and complaining," and later trying to clarify his comments by stating, "by the way I didn't say you were a bitch, I said you were being one."

2

(Id.). Plaintiff alleges that Howerton's "demeanor and anger were so intense that [plaintiff] feared for her personal safety." (Id.).

Following the events on October 9, 2020, plaintiff alleges she "was forced to attend [a human resources] meeting on October 12, 2020" with Howerton and other senior officials of defendant. (Id. ¶ 15). Plaintiff contends that, in that meeting, Howerton "attempted to force [plaintiff] to apologize for the events" that occurred on October 9. (Id.). Plaintiff alleges that during the October 12 meeting, Howerton "repeatedly talked over [plaintiff] and tried to create a false narrative." (Id.). Plaintiff's program director, "Dr. John Mark Miller" ("Miller") allegedly asked plaintiff during the meeting whether plaintiff was being a "bitch," in reference to the events on October 9. (Id.). Plaintiff also claims that "requests for information on how to receive counseling to cope with the trauma resulting from the October [9] meeting were ignored." (Id.).

Plaintiff alleges that on October 16, 2020, she "was forced to meet with [d]efendant's attorney" despite being denied the right to have her own counsel present, and after defendant refused to reschedule the October 16 meeting even though plaintiff "had requested an opportunity to meet with a therapist before the meeting[.]" (Id. ¶ 16). Further, plaintiff alleges she was informed October 20, 2020, "that no disciplinary action would be taken" against Howerton. (Id. ¶ 17). Plaintiff sought the help of defendant's human resources and graduate medical education departments to address "the conduct to which [plaintiff] was subjected," but plaintiff alleges that "[h]er complaints were not addressed in an appropriate or meaningful way." (Id. ¶ 19). Plaintiff also alleges that, after complaining about the proposed resident's retreat site, "[p]laintiff was subjected to a campaign of discrimination, harassment, and retaliation." (Id. ¶ 18).

Moreover, plaintiff alleges that she "was not provided the same access to resources provided to other residents such as residency program/hospital logo which impacted her ability to

3

complete her research poster," while "[o]ther residents had access to those resources." (Id. ¶ 27). Plaintiff also allegedly "had to endure an all-white nursing staff creating a list of fake ethnic names to mock African American babies" while "[n]o similar treatment was directed to non-African American babies." (Id. ¶ 28). Plaintiff further asserts that "[p]laintiff's work was subject to stricter scrutiny than her white and male coworkers." (Id. ¶ 29). Plaintiff alleges that "a white male coworker had numerous patient complaints" dismissed by Miller while complaints about plaintiff were not treated similarly. (Id.). Plaintiff allegedly "was also directed to fill in as a part of the nursing . . . staff[,]" but "[h]er colleagues were not required to perform nursing duties." (Id.). Moreover, plaintiff was allegedly told "to take messages and notes for a male co-resident" while "[m]ale resident physicians were not required to do so for their colleagues." (Id.). Plaintiff further asserts that "[p]laintiff was not given access to didactic activities when they occurred, but her colleagues were allowed to attend." (Id.).

In the fall of 2020, plaintiff "discovered that she had a hearing disability." (Id. ¶ 20). Plaintiff alleges that "in January 2021, [plaintiff] sought accommodations which [d]efendant failed to provide." (Id.). In February 2021, plaintiff allegedly "received a letter indicating that her residency contract would not be extended to the following year." (Id. ¶ 21). The letter cited plaintiff's "interpersonal issues . . . her refusal to uphold [defendant]'s culture and values" as the basis for defendant's decision. (Id.). After receiving the non-renewal letter, plaintiff alleges that defendant's representatives "assured [plaintiff] that [defendant] would not prevent [plaintiff] from being promoted" so long as plaintiff "met all professional and academic standards for the rest of the year." (Id. ¶ 22). Plaintiff also alleges that prior to the events that occurred during the October 9 meeting, "[p]laintiff had no significant complaints regarding her clinical competence and professionalism." (Id. ¶ 23). Plaintiff frequently worked at the hospital without an attending

4

physician on site and "advanced through her courses, even ahead of the rate of some of her colleagues." (Id.). Following plaintiff's objection to the suggested resident retreat site, plaintiff alleges that "she was subjected to a flurry of petty and frivolous complaints and her performance and actions were constantly and unfairly scrutinized compared to her white and male co-workers." (Id.).

Plaintiff further alleges that while plaintiff "only needed the twelve months of residency at [defendant] in order to graduate her program," defendant failed to "provide a program to ensure plaintiff's readiness for autonomous practice," and defendant erroneously stated that plaintiff had only completed the second-year of training where plaintiff alleges she had completed the requirements for the third year of residency. (Id. ¶¶ 8, 9). Plaintiff learned from other prospective employers that "Miller . . . provided only a basic statement indicating that [plaintiff] completed year two of her training, without reference to her having completed year three[,]" and also failed to provide "the basic information required in his letter." (Id. ¶ 24). Plaintiff also contends that while Miller submitted a letter to other programs, "either he or other members of [defendant] have called to say that they did not recommend [p]laintiff to their programs." (Id.). Plaintiff also alleges "that the Clinical Competency Committee [the "Committee"] had recommended that [plaintiff] be allowed to be proceed to autonomous practice[,]" (id. ¶ 10) but asserts that Miller rejected the Committee's recommendation. (Id. ¶ 11).

Plaintiff filed a claim with the Equal Employment Opportunity Commission ("EEOC"), which plaintiff supplemented with allegations of retaliation,[1] (see id. ¶ 45), and the EEOC issued plaintiff a right to sue letter September 25, 2022. (See id.).

---

[1] Where neither party has filed plaintiff's EEOC charge as an exhibit, the court relies only on the factual allegations alleged in the complaint.

5

**COURT'S DISCUSSION**

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[2] "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.  Analysis

Plaintiff asserts in her complaint that she was subject to discrimination based on race, sex, and retaliation, including through a course of conduct characterized as a "hostile work environment."  (Compl. ¶ 34).  The court begins its analysis with plaintiff's hostile work environment claim, followed by analysis of plaintiff's retaliation claim, discrimination claims apart from hostile work environment, and breach of contract.

  1.  Race and Sex Discrimination – Hostile Work Environment

"A hostile environment that violates Title VII exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Holloway v. Maryland, 32 F.4th 293, 300 (4th Cir. 2022).  "[T]o state a hostile work environment claim, [a

---

[2] Throughout this order, internal quotation marks and citations are omitted unless otherwise specified.

plaintiff] must allege that: (1) [s]he experienced unwelcome harassment; (2) the harassment was based on [her] race or protected activity; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Id. "While the first element is subjective, the rest of the test is made up of objective components based on a reasonable person standard." Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 781–82 (4th Cir. 2023).

Here plaintiff alleges facts giving rise to a plausible inference of each element of a hostile work environment claim based upon race and sex. Concerning the first element, plaintiff meets the subjective standard by alleging she experienced unwelcome harassment including through the conduct of Howerton, whose demeanor allegedly was "so intense [for plaintiff] that she feared for her personal safety." (Compl. ¶ 14). Turning to the second element, plaintiff alleges sufficient facts to permit an inference of harassment based upon sex, through Howerton's alleged use of gender-specific epithets. During the October 9 meeting, plaintiff alleges that Howerton called plaintiff "a bitch" and told her "to stop her bitching and complaining[.]" (Id.); see Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–21 (4th Cir. 2014) ("[A] raft of case law establishes that the use of sexually degrading, gender-specific epithets, such as . . . bitch . . . has been consistently held to constitute harassment based upon sex."); see also Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 303 (4th Cir. 2019) ("[B]ecause . . . stereotypes may cause superiors and coworkers to treat women in the workplace differently from men, it is plausibly alleged that [plaintiff] suffered sexual harassment because she was a woman.").

In addition, although a closer question, plaintiff alleges sufficient facts to permit an inference that her harassment also was based on race. A court "may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered

harassment of a kind likely to be motivated by race." McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 409 (4th Cir. 2022). "But a plaintiff cannot rely on her own conjecture to impute a racial character to what appears to be neutral harassment." Id. Here, there are no alleged racially derogatory comments or references to race by the alleged harasser, Howerton. See, e.g., Laurent-Workman v. Wormuth, 54 F.4th 201, 212 (4th Cir. 2022) (noting that "the sort of workplace behaviors that Title VII serves to root out [are] repeated invectives of an overtly racial tenor"). Nevertheless, Howerton's alleged harassment allegedly followed immediately from plaintiff's own statements complaining about race and "the impropriety of staging a work event at a plantation[.]" (Compl. ¶ 14). Because of this temporal proximity, coupled with the alleged intense demeanor and anger on the part of Howerton, including verbal abuse and physically cornering plaintiff, drawing all inferences from the allegations of the complaint in plaintiff's favor, it is plausible to infer the harassment was "motivated by race." McIver, 42 F.4th at 409.

Concerning the third element, a plaintiff "must clear a high bar in order to satisfy the objective severe or pervasive test." Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019). "The severe or pervasive conduct which gives rise to an abusive work environment must be both objectively and subjectively hostile and abusive." McIver, 42 F.4th at 407. "Objective analysis of whether a workplace is hostile and abusive looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. "The status of the harasser is also a significant factor to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious." Id. at 408.

Plaintiff has alleged sufficient facts to permit an inference that "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere[.]" Holloway, 32 F.4th at 300. Plaintiff alleges that Howerton "became verbally abusive towards [plaintiff]" and "repeatedly used offensive and sexist language[,]" including "calling [plaintiff] a bitch and telling her to stop her bitching and complaining[.]" (Compl. ¶ 14). While such offensive language is not alone actionable, multiple additional alleged facts and circumstances give rise to an inference of an objectively abusive atmosphere. First, plaintiff alleges that during the October 9 meeting Howerton "physically cornered [plaintiff] while [plaintiff] was attempting to distance herself from him." (Id.). "[T]he presence of physical threats undeniably strengthens a hostile work environment claim[.]" E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 318 (4th Cir. 2008). Second, plaintiff alleges that Howerton's "demeanor and anger were so intense that she feared for her personal safety." (Compl. ¶ 14). "[A]n isolated incident that is physically threatening or humiliating will be closer . . . to the type of conduct actionable on its own because it is extremely serious." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 284 (4th Cir. 2015) (en banc).

Third, the alleged harasser in this case, Howerton, was the defendant's CEO. "Simply put, a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Id. at 278. "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor . . . [where] a supervisor's use of a[n] . . . epithet impacts the work environment far more severely than use by co-equals." Id. (emphasis added). Here, Howerton was not only alleged to be senior to plaintiff, but the head of the entire company, creating an inference of a significant difference in status.

9

Fourth, the alleged harassment occurred immediately after plaintiff, the only black female resident, objected to a suggested resident retreat at the site of a former plantation. While that suggestion in of itself may not create a hostile work environment, "[i]t is impossible . . . to ignore the context in which the harassment took place." Sunbelt, 521 F.3d at 316; see also Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 209 (4th Cir. 2014) ("Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination depends on a constellation of surrounding circumstances, expectations, and relationships[,] . . . including the positions and ages of the harasser and victim, [and] whether the harassment was frequent, severe, humiliating, or physically threatening."). Plaintiff also alleges that following the October 9 meeting, plaintiff was summoned to a human resources meeting on October 12, where Howerton "attempted to force [plaintiff] to apologize for the events" that occurred October 9, her "requests for information on how to receive counseling . . . were ignored[,]" and Miller, another superior, "asked plaintiff if she was being a bitch," in reference to the October 9 meeting. (Compl. ¶ 15).

Fifth, while not actionable in themselves, plaintiff alleges multiple incidents that contributed, on top of all the foregoing, to a severe or pervasive work environment. Plaintiff allegedly endured "an all-white nursing staff creating a list of fake ethnic names to mock African American babies." (Id. ¶ 28) (emphasis added). Further, plaintiff contends that she was singled out among her all-white peers by not having "the same access to resources provided to other residents such as residency program/hospital logo[,]" fulfilling "nursing duties[,]" and "tak[ing] messages and notes for a male co-resident" although none of the other residents were required to do so. (Id. ¶¶ 27, 29).

10

Case 5:22-cv-00529-FL   Document 24   Filed 12/14/23   Page 10 of 20

Considering all these alleged circumstances together, plaintiff's complaint alleges sufficient facts to plausibly support the inference that the alleged harassment meets the severe or pervasive standard.

Finally, plaintiff also alleges sufficient facts to infer that "there is some basis for imposing liability on the employer." Holloway, 32 F.4th at 300. "Employers are generally presumed to be liable for hostile work environment harassment committed by supervisory employees," which presumption is met here because Howerton is defendant's CEO. White v. BFI Waste Servs., LLC, 375 F.3d 288, 299 (4th Cir. 2004); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").

Defendant argues that plaintiff's hostile work environment claim "presents a single event that could only be construed as engendering offensive, bruised or wounded feelings which fails to satisfy the 'high bar' required to show the behavior was sufficiently severe or pervasive to create an abusive work atmosphere." (DE 16 at 9 (quoting Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019)); see also McIver, 42 F.4th at 408 ("Often the relevant conduct occurs over a series of days or perhaps years and a single act of harassment may not be actionable on its own because such claims are based on the cumulative effect of individual acts."). However, the United States Court of Appeals for the Fourth Circuit has held that isolated incidents or harassment over a limited period can still engender a hostile work environment. See Boyer-Liberto, 786 F.3d at 281 ("We reject, however, any notion that our prior decisions . . . were meant to require more than a single incident of harassment in every viable hostile work environment case."). In Boyer-Liberto, an employee alleged race-based discrimination when she was fired soon after reporting that her

11

Case 5:22-cv-00529-FL   Document 24   Filed 12/14/23   Page 11 of 20

supervisor called her a "porch monkey" on two separate occasions. Id. at 280. When considering the severity and pervasiveness of the incident, the Fourth Circuit concluded that a reasonable jury could certainly find that the use of that racial epithet was "severe enough to engender a hostile work environment." Id. The court reasoned that the racial slur went "far beyond [a] merely unflattering" statement, to the extent that it was "degrading and humiliating in the extreme[,]" regardless of the frequency. Id. Here, the combination of Howerton's and Miller's alleged use of the word "bitch," the alleged physical intimidation against plaintiff, and Howerton's position as CEO of defendant, coupled with the context including alleged suggestion of a plantation as a retreat and mocking of black babies, permits an inference that "the harassment, though perhaps isolated, can properly be deemed to be extremely serious." Id. at 281.

In sum, defendant's motion is denied in that part seeking dismissal of plaintiff's claims of hostile work environment based on race and sex.

2. Retaliation

An employer may not retaliate against an employee "because he has opposed . . . an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated . . . in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). "A plaintiff can prove illegal retaliation . . . if [s]he shows that 1) [s]he engaged in protected activity, 2) [s]he suffered an adverse employment action . . . and 3) the employer took the adverse action because of the protected activity." Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543 (4th Cir. 2003).

Protected activity may consist inter alia of complaining to "superiors about suspected violations of Title VII," id. at 543–44, "filing . . . internal discrimination complaints," Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 650 (4th Cir. 2002), or filing an EEOC charge or

similar complaint with a state agency. See 42 U.S.C. § 2000e–3(a); see also Thomas v. City of Annapolis, Maryland, 821 F. App'x 341, 350 (4th Cir. 2021). An employee engages in protected activity not only when opposing "employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). "[A]n employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress." Boyer-Liberto, 786 F.3d at 282. "[W]hen assessing the reasonableness of an employee's belief that a hostile environment is occurring based on an isolated incident, the focus should be on the severity of the harassment." Id. at 284; see DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) ("This Circuit . . . has articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.").

Here, for purposes of the instant analysis, plaintiff has alleged protected activity based upon her complaints to superiors and "[d]efendant's Human Resources and Graduate Medical Education Department" about Howerton's conduct during the October 9 meeting. (Compl. ¶ 19).[3] This permits an inference plaintiff "stag[ed] informal protests" regarding Howerton's alleged behavior perceived as harassment during the October 9 meeting. McIver, 42 F.4th at 411.

Plaintiff also has alleged adverse employment actions based upon the January 2021 denial of plaintiff's disability accommodation request, non-renewal of plaintiff's contract in February

---

[3] The court agrees with defendant that, without more, plaintiff's opposition to a mere suggestion to host a retreat at a former plantation site does not by itself constitute "a reasonable belief that a hostile work environment is occurring." Boyer-Liberto, 786 F.3d at 284; see McIver, 42 F.4th at 411 ("Not all employee complaints are protected by Title VII's retaliation provision, and the law does not blindly ascribe to race all personal conflicts between individuals of different races."). Likewise, plaintiff's EEOC charge cannot constitute actionable protected activity in this case because it was filed after defendant took allegedly adverse employment actions.

13

2021, and defendant's failure thereafter to provide necessary information to future prospective employers. See Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (holding that in the context of a retaliation claim, an adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."). To be actionable, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse[.]" Id. The specter of denying a disability accommodation, failing to renew a contract, or withholding critical information for future opportunities "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Evans, 936 F.3d at 195; see also Laurent-Workman, 54 F.4th at 216 ("[A]ny action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination satisfies the materially adverse standard under the anti-retaliation provision.").

By contrast, plaintiff has not alleged conduct taking place after her complaints to superiors and to human resources, but before January 2021, constituting an adverse employment action. "[A] retaliatory hostile work environment must be so severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination." Laurent-Workman, 54 F.4th at 217. Plaintiff fails to allege sufficient facts to suggest that following her complaints to hospital superiors and human resources, her workplace conditions became "tantamount to an adverse employment outcome prohibited by the statute." Id. at 216. Indeed, many of plaintiff's assertions do not make clear whether plaintiff experienced the alleged conditions only after plaintiff complained about the alleged events during the October 9 meeting or whether they were conditions present throughout her year of employ with defendant. (See, e.g., compl. ¶ 27 ("Plaintiff was not provided the same access to resources provided to other residents such as

14

residency program/hospital logo[.]")); (see also id. ¶ 29 ("Plaintiff was not given access to didactic activities when they occurred, but her colleagues were allowed to attend.")).

Considering the intervening time period between protected activity sometime in fall 2020 and adverse employment actions in January 2021 and February 2021, plaintiff ultimately alleges sufficient facts to infer that "there is a causal connection between the protected activity and the adverse action." Evans, 936 F.3d at 195. With respect to causation, this element "can be shown in two ways: [1] by showing that the adverse act bears sufficient temporal proximity to the protected activity, or [2] by showing the existence of facts that suggest that the adverse action occurred because of the protected activity, or a combination of the two." Laurent-Workman, 54 F.4th at 218–19; see also Walker, 775 F.3d at 210 ("[T]he protected activity [must be] a but-for cause of her termination and not simply a motivating factor.").

"Temporal proximity [alone] between an employer's knowledge of protected activity and an adverse employment action may establish causation only if it is very close." Laurent-Workman, 54 F.4th at 219. A lapse of a few months or more defeats an inference of causation based on timing alone. See Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 126–27 (4th Cir. 2021) (three-to-four month proximity insufficient); Horne v. Reznick Fedder & Silverman, 154 F. App'x 361, 364 (4th Cir. 2005) (two-month proximity insufficient).

At this stage, plaintiff's timeline permits the court to infer retaliatory causation. Plaintiff does not specify the date when she "sought the help of [d]efendant's Human Resources and Graduate Medical Education Department regarding the conduct to which she was subjected." (Compl. ¶ 19). However, plaintiff's complaint suggests she engaged in this protected activity sometime following the meeting on October 20, 2020, when plaintiff "was informed that no disciplinary action would be taken against" Howerton. (Id. ¶ 17). The first alleged adverse

employment action, defendant's denial of plaintiff's disability request, took place in January 2021. Drawing inferences in plaintiff's favor, the court concludes that plaintiff has pleaded sufficient facts to plausibly infer causation based on temporal proximity. See King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (concluding that while ten weeks between protected activity and an adverse employment action "is sufficiently long so as to weaken significantly the inference of causation between the two events[,]" it still "gives rise to a sufficient inference of causation to satisfy the prima facie requirement[.]"; see Silva v. Bowie State Univ., 172 F. App'x 476, 478 (4th Cir. 2006) (same); see also Laurent-Workman, 54 F.4th at 219 (determining that while a two-month temporal gap between protected activity and adverse employment action weakens the inference of causation, "there is no bright-line rule for when temporal proximity helps or hurts a cause of action for retaliation").

Accordingly, because plaintiff sufficiently alleges a causal link between the protected activity and the adverse employment actions, plaintiff plausibly states a claim under Title VII's retaliation provision. In sum, defendant's motion is denied with respect to plaintiff's claim for retaliation.

3. Sex Discrimination[4]

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e–2(a)(1). "In the context of a Title VII case, an employment discrimination plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss[.]" Bing v. Brivo Sys., LLC, 959 F.3d

---

[4] Apart from a hostile work environment, plaintiff suggests she has pleaded a claim of sex discrimination through an adverse employment action under Title VII. (See Pl's Opp. (DE 19) at 13). She does not suggest a basis for her race discrimination claim other than through a hostile work environment. (See id. at 8). Accordingly, the court addresses herein only a standalone claim based on sex discrimination and not race discrimination.

16

605, 616 (4th Cir. 2020). "Instead, a Title VII plaintiff is required to allege facts to satisfy the elements of a cause of action created by that statute." Id.

To state a claim for sex discrimination under Title VII, a plaintiff must allege "the existence of some adverse employment action[.]" James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004). "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." Id. An adverse employment action, for example, must come with a "decrease in compensation, job title, level of responsibility, or opportunity for promotion," or involve a reassignment with "some significant detrimental effect." Id. at 376. "[D]islike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment." Adams v. Anne Arundel Cnty. Pub. Schs., 789 F.3d 422, 431 (4th Cir. 2015).

Regarding her sex discrimination claim, plaintiff suggests that defendant took adverse employment actions by denying plaintiff's January 2021 request for an accommodation due to a newly discovered hearing disability and sending plaintiff a non-renewal letter in February 2021. (Pl's Opp. (DE 19) at 13). Accepting for purposes of the instant analysis that these constitute adverse employment actions, plaintiff fails to allege sufficient facts to give rise to a plausible inference that defendant took these actions "because of her . . . sex." 42 U.S.C. § 2000e–2(a)(1). Plaintiff alleges no communications by defendant with respect to these actions that give rise to an inference of sex-based animus.

Plaintiff suggests that Howerton's use of the word "bitch" during the October 9 meeting plausibly supports an inference that the subject adverse actions were taken based upon plaintiff's sex. However, "unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." Brinkley v. Harbour Recreation

Club, 180 F.3d 598, 608 (4th Cir. 1999), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Here, because of the gap in time and the lack of any subject matter connection between Howerton's alleged remarks in October 2020 and the adverse actions in January and February 2021, plaintiff has not alleged sufficient facts plausibly tying together the alleged adverse employment actions and defendant's alleged discriminatory motives.

Accordingly, defendant's motion is granted in that part seeking dismissal of plaintiff's Title VII sex discrimination claim apart from a hostile work environment.

4. Breach of Contract

Defendant argues that plaintiff fails to state a claim for breach of contract. The court disagrees.

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276 (2019). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693–94 (1949). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976).

Section A.2. of the contract expressly states that defendant agrees "[t]o provide training for the Resident in the field of Family Medicine by providing the Program in accordance with ACGME standards." Plaintiff alleges that defendant breached the contract where defendant failed

to abide by certain incorporated ACGME provisions.[5] For example, plaintiff's allegation that Howerton called plaintiff a "bitch" and "cornered" plaintiff during the October 9 meeting permits a plausible inference that defendant violated II.B.2(e) of the ACGME policies, which allegedly requires institutions to "provide a safe, non retaliatory learning and work environment." (Compl. at 9). Moreover, plaintiff's allegations relating to Howerton's behavior during the October 9 meeting permit a plausible inference that defendant violated ACGME provisions II.A.4(a)(1) and II.A.4(a)(10), which allegedly require institutions to, respectively, "be a role model of professionalism" and "provide a learning and working environment in which residents have an opportunity to raise concerns and provide feedback without fear of intimidation or retaliation[.]" (Id.).

Defendant argues that plaintiff relies on conclusory allegations to support its breach of contract claim. However, the examples above demonstrate plaintiff has stated sufficient facts to state a claim that defendant violated the incorporated ACGME provisions. Thus, at this juncture, plaintiff has alleged sufficient facts for the court to plausibly infer a valid contract between plaintiff and defendant and a breach of at least some of the ACGME policies expressly incorporated in the contract.

Defendant also argues that plaintiff cannot state a breach of contract claim because plaintiff failed to perform "a mandatory prerequisite to bringing that claim." (DE 16 at 14). Defendant attaches plaintiff's executed contract with defendant to its motion to dismiss. (See DE 16-1). Section C.7. of the contract requires "That the Institution and the Resident shall immediately notify the Council on Postdoctoral Training of the ACGME in writing in the event of a breach or

---

[5] In particular, plaintiff alleges that defendant violated the following provisions of the incorporated ACGME standards: I.D.1(a)(6), I.D.1(a)(6)(a), I.D.1(c), I.D.2, I.D.2(b) and (c), II.A.4(a)(1),(2),(8), and (10), II.B.2(e), (f), (g)(3), and (g)(4), III.C., IV.A.3, IV.A.4(a), and VA.1(a), (b), and (d).

19

unilateral termination of this Contract by either party[.]" Defendant alleges that plaintiff's failure to satisfy Section C.7. bars her breach of contract claim.

However, the complaint does not allege that plaintiff failed to satisfy this condition, and the only basis for making this inference is argument by counsel in defendant's brief, which the court cannot accept as a factual allegation upon a motion to dismiss. Moreover, in plaintiff's response in opposition to defendant's motion to dismiss, plaintiff avers that "[p]laintiff filed a complaint with the Council consisting of [twenty-seven] pages and identifying with specificity the material breaches of the contract." (Pl's Opp. (DE 19) at 15 n.1). Therefore, the court will not bar plaintiff's breach of contract claim on this basis.

In sum, defendant's motion to dismiss plaintiff's breach of contract claim is denied.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 15) is GRANTED IN PART and DENIED IN PART as set forth herein. Plaintiff's claims of hostile work environment, retaliation, and breach of contract are allowed to proceed. Plaintiff's standalone sex discrimination claim is DISMISSED for failure to state a claim for which relief can be granted, under Rule 12(b)(6). In accordance with Rule 12(a)(4), defendant shall file a responsive pleading within 14 days of the date of this order.

SO ORDERED, this the 14th day of December, 2023.

_____
LOUISE W. FLANAGAN
United States District Judge